IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS HOLLIDAY, | No. CIV S-07-1422-LKK-CMK-P |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| B. NAKU, et al., | |
| Defendants. | |
| _____/ | |

Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is defendant Naku's motion for summary judgment (Doc. 22).[1]

/ / /
/ / /
/ / /
/ / /
/ / /

---

[1] This action also proceeds as against defendant Traquina, who did not file a dispositive motion by the cut-off date, which was 60 days after October 13, 2008.

1

# I. BACKGROUND

### A. Plaintiff's Allegations

This action proceeds on plaintiff's original complaint which names D.K. Sisto, the prison warden, B. Naku, a doctor, and A. Traquina, the chief medical officer.[2] Plaintiff states that he injured a finger on his right hand on September 9, 2006, while playing football. He reported to the prison medical clinic where he was treated by P. Campbell, a nurse. Campbell wrapped the finger, provided pain relievers, and recommended a follow-up with a prison doctor. According to plaintiff, an x-ray was taken on September 11, 2006, which revealed a fracture of the right fourth finger. On September 12, 2006, he was seen by defendant Naku, who placed a splint on plaintiff's finger and ordered an orthopedic consultation within seven days.

After a week had passed with no further treatment, plaintiff submitted an inmate appeal requesting treatment. He stated that he was in terrible pain and that the medication he had been given was not effective. Plaintiff also stated in his appeal that he was unable to use his right hand at all and that he feared permanent damage. Plaintiff was seen on September 19, 2006, by defendant Naku. Plaintiff states that defendant Naku told him that he was still awaiting authorization for an outside consultation and that the doctor continued him on his current pain medication. On September 20, 2006, plaintiff wrote a "personal letter" to defendant Traquina complaining of the pain in his finger and informing him that he had not received any treatment. On September 26, 2006, plaintiff received a response from defendant Traquina indicating that a "consultation was written" and that "an appointment is pending scheduling." On September 29, 2006, defendant Traquina issued a second level response to plaintiff's inmate appeal, concluding that his medical issues have been addressed and that the treatment he has received to date was appropriate.

///

---

[2] Sisto was dismissed on January 28, 2008.

As of October 12, 2006, plaintiff still had not seen an orthopedic specialist for consultation and plaintiff submitted his appeal for review at the director's level. In this appeal, plaintiff noted that it had been over a month since his injury. Plaintiff submitted another inmate appeal on November 9, 2006, complaining that he still had not received adequate treatment for his finger. He requested that he immediately be taken to an outside hospital for consultation and treatment "so I do not lose the use of my finger." On November 27, 2006, plaintiff received a response to his most recent appeal from Dr. Hsieh. According to plaintiff, the doctor stated that "[a]n urgent referral has been submitted on your behalf." As of December 10, 2006, plaintiff still had not been scheduled for an outside consultation and he submitted another inmate appeal. This appeal was answered at the director's level on December 27, 2006, with an indication that no unresolved issues remained because his earlier appeals had been partially granted.

On January 8, 2007, plaintiff received a response to an earlier appeal stating that "efforts are being made to get you evaluated by a hand surgeon at U.C. San Francisco." As of May 9, 2007, plaintiff still had not been scheduled for an outside consultation and plaintiff requested an interview with defendant Traquina. Plaintiff states that he was finally taken to U.C. San Francisco for an outside consultation on June 22, 2007. He states that his injured finger was re-broken, tendons in the finger were removed, and the finger was set in what he describes as a "permanent claw" position. Plaintiff states that the attending physician at U.C. San Francisco told him that, had he received treatment within one month of the injury, he could have expected a full recovery.

**B.     The Parties' Evidence**

Defendant Naku's evidence, which consists of his declaration, documents from plaintiff's prison medical file, and plaintiff's responses to discovery, reveal the following:

> 1.     Defendant Naku's duties were to see prisoners and to treat their medical problems based on the history they provided and his own objective findings;

///

3

2.    Defendant Naku saw plaintiff clinically for the first time on September 12, 2006, and conducted a focused examination of plaintiff's finger and noted that plaintiff was not in distress but that he had marked tenderness of his right fourth finger with an inability to flex the finger;

3.    Defendant Naku assessed a probable fracture and ordered an x-ray;

4.    The x-ray revealed a small chip fracture of the base of the distal phalanx of the fourth right finger;

5.    Defendant Naku placed a splint on plaintiff's injured finger and prescribed Motrin for pain;

6.    Defendant Naku also wrote an urgent referral for plaintiff to have an outside orthopedic consultation within seven days;

7.    Defendant Naku prescribed a continuation of pain medication on September 19, 2006, and scheduled plaintiff for a follow-up with him;

8.    Defendant Naku next saw plaintiff on October 2, 2006, and informed plaintiff that he had been scheduled to be seen by Dr. Michael Shifflett, an orthopedic specialist at Queen of the Valley Hospital in Napa, California, the following week;

9.    At the October 2, 2006, follow-up, defendant Naku also renewed plaintiff's pain medications;

10.    Plaintiff's medical records indicate that he was seen by Dr. Shifflett on October 14, 2006, and that he had surgery to repair his finger on June 22, 2007;

11.    Defendant Naku did not have any contact with plaintiff or involvement in his case after October 2, 2006; and

12.    Defendant Naku does not have any control or responsibility relating to how soon an inmate can be seen by an outside specialist.

In his opposition to defendant's motion, plaintiff states that defendant "failed to do anything about the failure or delay. . . ." He also states that defendant Naku's claim that he was highly responsive to plaintiff's injury is untrue and that defendant was part of a medical "assembly line." However, other than his own declaration and verified complaint, plaintiff does not provide any evidence to support his contentions or place any of the facts outlined by defendant Naku in dispute.

/ / /

4

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

1  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
2  of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);
3  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and
4  that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict
5  for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

6          In the endeavor to establish the existence of a factual dispute, the opposing party
7  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the
8  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
9  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary
10 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
11 genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory
12 committee's note on 1963 amendments).

13         In resolving the summary judgment motion, the court examines the pleadings,
14 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
15 any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See
16 Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed
17 before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.
18 Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to
19 produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen
20 Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.
21 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply
22 show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken
23 as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no
24 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).
25 / / /
26 / / /

### III.  DISCUSSION

Defendant Naku argues: (1) plaintiff cannot establish that he was deliberately indifferent to plaintiff's medical needs; and (2) he is entitled to qualified immunity.

### A.  Deliberate Indifference

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency."  Estelle v. Gamble, 429 U.S. 97, 102 (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety."  Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind."  See id.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition

7

is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain. See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989). The complete denial of medical attention may constitute deliberate indifference. See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986). Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference. See Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury. See McGuckin, 974 F.2d at 1060.

Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 106. Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

Defendant argues:

> There is no evidence of deliberate indifference by DR. NAKU. On the contrary, the evidence clearly shows that DR. NAKU was highly responsive to the medical needs of HOLLIDAY on the three instances in which HOLLIDAY had appointments with DR. NAKU. [¶] . . . On each of the three appointments, DR. NAKU responded to HOLLIDAY'S medical needs, either by examining his finger, ordering a[n] x-ray, placing a splint on his finger, prescribing pain medications, writing an urgent referral, or following up with HOLLIDAY to address continuing issues. DR. NAKU is, therefore, entitled to summary judgment of HOLLIDAY'S claim of deliberate indifference.

/ / /

1  The court agrees with defendant's analysis of the undisputed evidence, which shows that
2  defendant Naku provided treatment to plaintiff on three occasions – September 12, 2006,
3  September 19, 2006, and October 2, 2006.  On September 12, 2006, the doctor examined
4  plaintiff's finger, diagnosed a possible fracture, and obtained an x-ray.  Defendant Naku also
5  provided plaintiff with pain medication and wrote an order for a referral to an outside specialist
6  within seven days.  On September 19, 2006, and October 2, 2006, defendant Naku examined
7  plaintiff's finger again and renewed his prescription for pain medications.[3]

        Far from showing that defendant Naku was deliberately indifferent to plaintiff's medical needs, the facts show that the doctor provided plaintiff with prompt and appropriate treatment.  In particular, defendant Naku ordered an urgent referral the first time he saw plaintiff on September 12, 2006, which was just a few days after plaintiff's injury.  As to the delay in obtaining an outside consultation, plaintiff's medical records reveal that he was seen by Dr. Shifflett at a hospital in Napa, California, on October 14, 2006, which was just over a month after the injury.   While surgery was not performed until July 2007, plaintiff has not offered any evidence to dispute Dr. Naku's statement that he had no responsibility over the referral process and, thus, was not in a position to prevent delay.  In any event, by ordering an urgent referral on September 12, 2006, Dr. Naku did not exhibit deliberate indifference to the need for immediate outside consultation.

        For these reasons, the court finds that the evidence establishes the absence of any genuine dispute of fact as to deliberate indifference on the part of defendant Naku, who is entitled to judgment in his favor as a matter of law.

/ / /

/ / /

/ / /

---

[3] The court notes that plaintiff omitted the October 2, 2006, visit with defendant Naku in his statement of facts alleged in the complaint.

B. **Qualified Immunity**

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201 (2001). If, and only if, a violation can be made out, the next step is to ask whether the right was clearly established. See id. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Id. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 202 (citation omitted). Thus, the final step in the analysis is to determine whether a reasonable officer in similar circumstances would have thought his conduct violated the alleged right. See id. at 205.

When identifying the right allegedly violated, the court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than the factual circumstances surrounding the alleged violation. See Kelly v. Borg, 60 F.3d 664, 667 (9th Cir. 1995). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand [that] what [the official] is doing violates the right." See Anderson v. Creighton, 483 U.S. 635, 640 (1987). Ordinarily, once the court concludes that a right was clearly established, an officer is not entitled to qualified immunity because a reasonably competent public official is charged with knowing the law governing his conduct. See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). However, even

if the plaintiff has alleged a violation of a clearly established right, the government official is entitled to qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct did not violate the right." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see also Saucier, 533 U.S. at 205.

The first two steps in the qualified immunity analysis involve purely legal questions. See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996). The third inquiry involves a legal determination based on a prior factual finding as to the government official's conduct. See Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995). In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

As indicated above, the threshold inquiry is whether the facts alleged, when viewed in the light most favorable to the plaintiff, show that defendant Naku violated plaintiff's constitutional rights. The court finds that they do not. Plaintiff states that he was seen by defendant Naku on September 12, 2006, and September 19, 2006. Plaintiff also asserts that, on September 12, 2006, defendant Naku ordered an urgent referral. These factual allegations alone belie any deliberate indifference by defendant Naku.

Assuming for the moment, however, that plaintiff's complaint shows a constitutional violation, it is obvious that the Eighth Amendment right is clearly established in the context of the facts outlined by plaintiff. Turning, then, to the final step of the qualified immunity analysis, the court finds that defendant Naku could have reasonably believed that his conduct did not violate plaintiff's rights. In particular, the undisputed evidence establishes that defendant Naku treated plaintiff promptly and appropriately and that such treatment included writing an order for an urgent referral for outside consultation by an orthopedic specialist. Given that defendant Naku had no responsibility or involvement in the referral process, he could have reasonably believed that his actions were sufficient to discharge his duty to provide plaintiff with constitutionally adequate medical care.

For these reasons, the court concludes that defendant Naku is entitled to qualified immunity.

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1. Defendant Naku's motion for summary judgment (Doc. 22) be granted;
2. Defendant Naku be terminated as a party to this action; and
3. The case be referred back to the Magistrate Judge for further proceedings as to plaintiff's claim against defendant Traquina.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  June 25, 2009

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE